UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

————————————————————————

OLVIN GEOVANY RODRIGUEZ,

        Petitioner,

    v.                                                                   20-cv-00886-LJV
                                                                                    DECISION & ORDER
WILLIAM BARR, *United States Attorney
General*;

MR. KEVIN MCALEENAN, *Secretary of
the Department of Homeland Security*;

MR. THOMAS FEELY, *Field Office
Director for Detention Removal*;

MR. JEFFERY SEARLS, *Facility Director
Buffalo Federal Detention Center*;

MICHAEL BALL, *SDDO*;

        Respondents.[1]

————————————————————————

      Olvin Geovany Rodriguez has been detained in the custody of the United States

Department of Homeland Security since June 5, 2018—nearly 28 months.  Docket Item

5-2 at 29.  On July 14, 2020, Rodriguez filed a *pro se* petition for a writ of habeas

corpus under 28 U.S.C. § 2241, challenging the validity of his detention at the Buffalo

---

[1] In its memorandum of law, the respondents argue that the only proper
respondent in this matter is Jeffrey Searls, "the person with direct control over
[Rodriguez]."  Docket Item 6 at 21.  "Because resolution of who is the proper respondent
will not affect the disposition of this petition, the Court will not address it further."
*Khemlal v. Shanahan*, 2014 WL 5020596, at *2 n.3 (S.D.N.Y. Oct. 8, 2014).  It is clear
that, at the very least, Searls "has the *immediate custody* of the party detained, with the
power to produce the body of such party before the court or judge, [so] that he may be
liberated if no sufficient reason is shown to the contrary."  *Rumsfeld v. Padilla*, 542 U.S.
426, 435 (2004) (emphasis in original) (quoting *Wales v. Whitney*, 114 U.S. 564, 574
(1885)).

Federal Detention Facility in Batavia, New York.  Docket Item 1.  On August 27, 2020,

the respondents answered the petition, Docket Items 5, 6; and on September 10, 2020,

Rodriguez replied, Docket Item 7.

For the reasons that follow, this Court grants Rodriguez's petition in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts, taken from the record, come largely from filings with the

United States Department of Homeland Security ("DHS"), Immigration and Customs

Enforcement ("ICE").

Rodriguez is a native and citizen of Honduras.  *See* Docket Item 1 at 1; Docket

Item 5-2 at 22.  He first entered the United States in 1995 at an unknown place without

being admitted or paroled by an immigration officer.  *Id.* at 3, 23-24.

On August 18, 1999, Rodriguez applied for temporary protected status with the

Immigration and Naturalization Service.  *Id.* at 2-7.  He failed to submit any evidence

supporting his application, however, resulting in its denial.  *Id.* at 8-10.  On August 15,

2006, Rodriguez departed the United States via a TACA Airlines flight.  *Id.* at 24.  Then,

sometime before November 2017, Rodriguez re-entered the United States without being

admitted or paroled by an immigration officer.  *Id.*

On April 5, 2018, Rodriguez was convicted of disorderly conduct after pleading

guilty in Nassau District Court, Hempstead, New York. *Id.* at 11.  He was sentenced to a

term of incarceration of 15 days.  *Id.*

On May 15, 2018, Rodriguez was convicted, again after pleading guilty in the

same court, of criminal possession of a controlled substance in the seventh degree.  *Id.*

at 16.  He was sentenced to a term of incarceration of six months, and his driver's license was suspended for that same time period.  *Id.*

On June 5, 2018, DHS served Rodriguez with a "Notice to Appear," charging that he was subject to removal from the United States under 8 U.S.C. § 1182(a)(6)(A)(i) for being present in the United States without having been admitted or paroled.  *See* Docket Item 5-2 at 30-32.  That same day, DHS took Rodriguez into custody, *id.* at 29, and also determined that he would continue to be detained pending a final administrative determination of his case, *id.* at 33-34.  Although the respondents represent that DHS found Rodriguez subject to mandatory detention under 8 U.S.C. § 1226(c), *see* Docket Item 5-1 (declaration of Robert Morris, ICE Deportation Officer) at 4, DHS Officer Bryan Flanagan in fact checked the box "discretionary detention under [section] 1226(c)" on a form entitled "Addendum to Notice of Custody Determination," Docket Item 5-2 at 34.

Rodriguez first appeared before an Immigration Judge ("IJ") on September 10, 2018.  Docket Item 5-4 (declaration of Elizabeth Burgus, Paralegal Specialist, Executive Office for Immigration Review) at 2.  That hearing was adjourned to November 7, 2018, *id.* at 2, when the IJ denied Rodriguez's request to be released on bond, Docket Item 5-2 at 35; Docket Item 5-3 at 1-5.  The IJ first found that Rodriquez was subject to mandatory detention under section 1226(c) because "there [was] reason to believe that he [was] or ha[d] been an illicit trafficker in [a] controlled substance."  Docket Item 5-3 at 2 (citing 8 U.S.C. § 1182(a)(2)(C)).  The IJ then noted that even if Rodriguez was subject only to discretionary detention, the IJ still would deny the request because Rodriguez "ha[d] not established that he [was] not a danger to the community."  *Id.* at 4.

The Board of Immigration Appeals ("BIA") affirmed that decision on April 18, 2019, upholding both grounds for denying Rodriquez's request for release. *Id.* at 6-8. Since that time, DHS has three times—in April, June, and July 2020—determined that Rodriguez's continued detention is justified because he "ha[d] not established to ICE's satisfaction that [he] [was] not a flight risk." *Id.* at 23, 25-26; *see also id.* at 32.

On November 7, 2018, Rodriguez, through counsel, applied for relief from removal. Docket Item 5-4 at 2. The IJ subsequently granted five adjournments—one "at the request of [Rodriquez]," one "to allow [Rodriguez] time to seek [new] representation," two to "allow [Rodriguez] time to prepare," and one "due to a malfunction of the televideo." *Id.* at 2-3. On July 3, 2019, the IJ denied Rodriguez's applications for relief from removal and order him removed to Honduras. Docket Item 5-3 at 9-10.

On July 12, 2019, Rodriguez appealed that decision to the BIA, Docket Item 5-4 at 3, which dismissed the appeal on December 9, 2019, Docket Item 5-3 at 11-12. On December 27, 2019, Rodriguez petitioned the United States Court of Appeals for the Second Circuit for review of the BIA's decision and for a stay of removal. *See Rodriguez v. Barr*, No. 19-3271 (2d Cir. 2019). That petition is pending. *See id.*

Rodriguez remains in DHS custody at BFDF. Docket Item 5-1 at 7.

## DISCUSSION

### I. HABEAS PETITION

28 U.S.C. § 2241 "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the laws or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C.

§ 2241(c)(3)).  The government maintains that Rodriguez is validly detained under 8

U.S.C. § 1231(a) as a noncitizen subject to a final order of removal.  Docket Item 6 at

10-16.

Rodriguez disagrees for three reasons.  First, he contends that his detention for

over six months is "unlawful and contravenes 8 U.S.C. § 1231(a)(6) as interpreted by

the Supreme Court in *Zadvydas* [*v. Davis*, 533 U.S. 678, 701 (2001)]."  Docket Item 1 at

3.  The Court construes Rodriguez's first claim as arguing that his continued detention

violates 28 U.S.C. § 1231(a)(6) because there is "good reason to believe that there is

no significant likelihood of [his] removal in the reasonably foreseeable future."[2]  *See*

*Zadvydas*, 533 U.S. at 701.  Second, Rodriguez argues that his "indefinite" detention

violates his right to substantive due process under the Fifth Amendment of the United

States Constitution.  *Id.* at 4.  And third, he argues that his detention without "a timely

and meaningful opportunity to demonstrate that [he] should not be detained" violates his

right to "procedural due process" under the Fifth Amendment.  *Id.* at 4.

## II. STATUTORY CHALLENGE

This Court begins by considering the statutory basis for Rodriguez's detention in

order to evaluate his first challenge, alleging that his continued detention violates 8

U.S.C. § 1231 as interpreted by the Supreme Court in *Zadvydas*, 533 U.S. at 701.  The

government and Rodriguez seem to agree that Rodriguez's detention is governed by 8

---

[2] Because Rodriguez is proceeding *pro se*, this Court holds his submissions "to less stringent standards than formal pleadings drafted by lawyers."  *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

U.S.C. § 1231(a).  *See* Docket Item 1 at 2; Docket Item 6 at 10-16.  But this Court disagrees and finds that Rodriguez's detention is governed by 8 U.S.C. § 1226.

"Broadly speaking, section 1226 governs the detention of immigrants who are not immediately deportable."  *Hechavarria v. Sessions*, 891 F.3d 49, 57 (2d Cir. 2018). Section 1231, on the other hand, "addresses the 'removal period' for immigrants facing deportation."  *Id.* at 53.  "[T]he 'removal period' [is] the term used in the statute to describe the 90-day period following an order of removal during which 'the Attorney General shall remove the [noncitizen].'"  *Id.* at 54 (quoting 8 U.S.C. § 1231(a)(1)(A)).

> The statute explicitly defines the beginning of the removal period as occurring "on the latest of the following:
>
> > (i) The date the order of removal becomes administratively final.
> >
> > (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the [noncitizen], the date of the court's final order.
> >
> > (iii) If the [noncitizen] is detained or confined (except under an immigration process), the date the [noncitizen] is released from detention or confinement."

*Id.* at 54-55 (quoting 8 U.S.C. § 1231(a)(1)(B)).

Rodriguez has asked the Second Circuit to review the BIA's decision and to stay his removal.  *See Rodriguez*, No. 19-3271 (2d Cir. 2019).  Under DHS's forbearance agreement with the Second Circuit, "DHS will not remove a [noncitizen] who has requested a stay of removal with a petition for review of an immigration order of removal unless a government motion opposing the stay is granted by the court or the [noncitizen's] stay motion is otherwise denied."  *Sankara v. Whitaker*, 2019 WL 266462, at *4 (W.D.N.Y. Jan. 18, 2019).  This Court accordingly has held that until a Second Circuit panel rules on a noncitizen's request for a stay of his removal, the "forbearance

agreement amounts to a court ordered stay of the removal of the [noncitizen]." *See Hemans v. Searls*, 2019 WL 955353, at *3 (W.D.N.Y. Feb. 27, 2019); *Sankara*, 2019 WL 266462, at *4. In other words, this Court construes the forbearance agreement as effectively rendering Rodriguez's removal stayed under 8 U.S.C. § 1231(a)(1)(B)(ii). Therefore, Rodriguez is detained under section 1226.

Because Rodriguez is not detained under section 1231(a), this Court rejects his argument that his detention violates that provision as interpreted by the Supreme Court in *Zadvydas*.

### III. DUE PROCESS

Rodriguez also alleges that his continued detention violates the Due Process Clause. *See* Docket Item 1 at 4. The Fifth Amendment's Due Process Clause forbids the federal government from depriving any "person . . . of . . . liberty . . . without due process of law." U.S. Const. amend. V. The Supreme Court "has held that the Due Process Clause protects individuals against two types of government action." *United States v. Salerno*, 481 U.S. 739, 746 (1987). "So-called 'substantive due process' prevents the government from engaging in conduct that shocks the conscience, . . . or interferes with rights implicit in the concept of ordered liberty." *Id.* (citations omitted). "When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner." *Id*. "This requirement has traditionally been referred to as 'procedural' due process." *Id*.

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. "[G]overnment detention violates that Clause unless the

detention is ordered in a *criminal* proceeding with adequate procedural protections . . . or, in certain special and narrow nonpunitive circumstances, . . . where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id.* (emphasis in original) (citations omitted).  Other than those unique, special, and narrow circumstances, "[o]nly a jury, acting on proof beyond a reasonable doubt, may take a person's liberty.  That promise stands as one of the Constitution's most vital protections against arbitrary government." *United States v. Haymond*, 139 S. Ct. 2369, 2373 (2019).

"[Noncitizens], even [noncitizens] whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth . . . Amendment[ ]." *Plyer v. Doe*, 457 U.S. 202, 210 (1982); *see also Shaughnessey v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1954) ("It is true that [noncitizens] who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.").  At the same time, Congress has "broad power over naturalization and immigration, [permitting it to] make[ ] rules that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 521 (2003) (quoting *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976)).

## A.    Substantive Due Process

Rodriguez argues that his detention violates his right to substantive due process. Docket Item 1 at 4.  He has been in DHS custody since June 5, 2018—nearly 28 months.  Docket Item 5-2 at 29.  But this Court cannot say that detention that long

violates due process.  *See Sanusi v. I.N.S.*, 100 F. App'x 49, 51 (2d Cir. 2004)

(summary order) (determining that six-year detention did not violate due process).

Indeed, detention under section 1226 may serve the government's compelling interests

in both "preser[ving] the government's ability to later carry out its broader responsibilities

over immigration matters," *Doherty v. Thornburgh*, 943 F.2d 204, 211 (2d Cir. 1991),

and preventing crime by arrestees who pose a danger to the safety of the community,

*see Salerno*, 481 U.S. at 749.  Although there comes a time when the length of a

noncitizen's detention pending removal violates due process regardless of the

procedural protections afforded, *see Salerno*, 481 U.S. at 747 n.4, that time has not yet

come here.

### B.    Procedural Due Process

Rodriguez also challenges the procedural safeguards that apply to his continued

detention.  Docket Item 1 at 4.  The Due Process Clause is not offended by the

mandatory detention of noncitizens for the "*brief period necessary* for their removal

proceedings," *Demore*, 538 U.S. at 513 (emphasis added), but may be violated by

detention beyond that "brief" period, depending on the balance of the individual's and

the government's interests, *see, e.g.*, *id.* at 532 (Kennedy, *J.*, concurring) ("[A] lawful

permanent resident . . . could be entitled to an individualized determination as to his risk

of flight and dangerousness if the continued detention bec[omes] unreasonable or

unjustified."); *see also Landon v. Plasencia*, 459 U.S. 21, 34 (1982) ("The constitutional

sufficiency of procedures provided in any situation, of course, varies with the

circumstances.").

For that reason, this Court "has evaluated procedural due process challenges to immigration detention with a two-step inquiry." *Hemans*, 2019 WL 955353, at *5. "A[t] the first step, the Court considers whether the [noncitizen's] detention has been unreasonably prolonged." *Id.* "If it has not, then there is no procedural due process violation." *Id.* "But if it has, the Court proceeds to step two and 'identifies the specific dictates of due process' by considering the *Mathews v. Eldridge* factors." *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). "If the government has not provided the procedural safeguards dictated by the *Mathews* factors to a [noncitizen] subject to unreasonably prolonged detention, then his continued detention violates procedural due process." *Id.*

### 1.    Rodriguez's Detention

"[W]hen weighing the lawfulness of continued detention of a [noncitizen] under the Due Process Clause," several factors determine whether detention is unreasonably prolonged. *Jamal A. v. Whitaker*, 2019 WL 549722, at *3 (D. Minn. Jan. 22, 2019). This Court, for example, has considered "(1) the total length of detention to date; (2) the conditions of detention; (3) delays in the removal proceedings caused by the parties; and (4) the likelihood that the removal proceedings will result in a final order of removal." *Hemans*, 2019 WL 955353, at *6.

First, and most important, courts consider the length of detention. Rodriguez has been in DHS custody since June 5, 2018—nearly 28 months. Docket Item 5-2 at 29. "As detention continues past a year, courts become extremely wary of permitting continued custody absent a bond hearing." *Muse v. Sessions*, 2018 WL 4466052, at *4 (D. Minn. Sept. 18, 2018) (and cases cited therein). In fact, courts have found detention

even shorter than a year to be unreasonably prolonged as part of a procedural due process analysis.[3]

In *Demore*, the Supreme Court upheld the constitutionality of section 1226(c), relying on the "very limited time of . . . detention at stake" and noting that "in the majority of cases[, section 1226(c) detention] lasts less than the 90 days . . . considered presumptively valid in *Zadvydas*." *Demore*, 538 U.S. at 529 & n.12; *see also id.* ("[I]n 85% of the cases in which [noncitizens] are detained pursuant to [section] 1226(c), removal proceedings are completed in an average time of 47 days and a median of 30 days.  In the remaining 15% of cases, in which the [noncitizen] appeals the decision of the Immigration Judge to the Board of Immigration Appeals, appeal takes an average of four months, with a median time that is slightly shorter." (citations omitted)).

Rodriguez's 28-month detention is seven times the four-month average cited in *Demore*.  The length of Rodriguez's detention therefore strongly supports his argument that his detention without an individualized bond hearing has been unreasonably prolonged.

Second, courts consider the conditions of detention.  Whether "the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention" factors into the reasonableness of Rodriguez's detention.  *Sajous v. Decker*,

---

[3] *See, e.g.*, *Vargas v. Beth*, 2019 WL 1320330, at *8 (E.D. Wis. Mar. 22, 2019) ("approximately nine and a half months"); *Cabral v. Decker*, 331 F. Supp. 3d 255, 261 (S.D.N.Y. 2018) ("over seven months" and "over nine months" by the next removal-related hearing); *Hernandez v. Decker*, 2018 WL 3579108, at *1, *12 (S.D.N.Y. July 25, 2018) (nine months); *Sajous v. Decker*, 2018 WL 2357266, at *1, *12 (S.D.N.Y. May 23, 2018) (over eight months); *Jarpa v. Mumford*, 211 F. Supp. 3d 706, 720 (D. Md. 2016) (exceeding ten months); *see also Sopo v. U.S. Attorney General*, 825 F.3d 1199, 1218 (11th Cir. 2016) ("[A] criminal [noncitizen's] detention without a bond hearing may often become unreasonable by the one-year mark, depending on the facts of the case.").

2018 WL 2357266, at *11 (S.D.N.Y. May 23, 2018).  "The more that the conditions

under which the [noncitizen] is being held resemble penal confinement, the stronger his

argument that he is entitled to a bond hearing."  *Muse*, 2018 WL 4466052, at *5.

Neither the petitioner nor the respondents have provided information about the

conditions at BFDF, so this factor does not favor either party.

   Third, courts consider whether the detainee has prolonged his own detention.

The Second Circuit has found that this factor weighs against finding detention

unreasonable when a noncitizen has "substantially prolonged his stay by abusing the

processes provided to him" but not when "an immigrant . . . [has] simply made use of

the statutorily permitted appeals process."  *Hechavarria*, 891 F.3d at 56 n.6 (first quoting

*Nken v. Holder*, 556 U.S. 418, 436 (2009)).  As the Sixth Circuit has noted, "appeals

and petitions for relief are to be expected as a natural part of the process.  A

[noncitizen] who would not normally be subject to indefinite detention cannot be so

detained merely because he seeks to explore avenues of relief that the law makes

available to him."  *Ly v. Hansen*, 351 F.3d 263, 272 (6th Cir. 2003) (cited in

*Hechavarria*, 891 F.3d at 56 n.6).  Indeed,

> although a [noncitizen] may be responsible for seeking relief, he is not
> responsible for the amount of time that such determinations may take.  The
> mere fact that a [noncitizen] has sought relief from deportation does not
> authorize the [government] to drag its heels indefinitely in making a
> decision.  The entire process, not merely the original deportation hearing, is
> subject to the constitutional requirement of reasonability.

*Id*.

   Here, DHS charged Rodriguez with removability on in June 2018.  Docket Item 5-

2 at 30-32.  After taking time to retain counsel, Rodriquez applied for relief from removal

in November 2018.  Docket Item 5-4 at 2.  The IJ subsequently granted five

12

adjournments—one "at the request of [Rodriquez]," one "to allow [Rodriquez] time to seek [new] representation," two to "allow [Rodriquez] time to prepare," and one "due to a malfunction of the televideo." *Id.* at 2-3. Less than two weeks after the IJ denied Rodriguez's applications for relief in July 2019, Rodriguez appealed that denial to the BIA, Docket Item 5-3 at 9-10; Docket Item 5-4 at 3, which did not dismiss the appeal until December 2019, Docket Item 5-3 at 11-12. Rodriguez then promptly petitioned the United States Court of Appeals for the Second Circuit for review of the BIA's decision and for a stay of removal. *See Rodriguez*, No. 19-3271 (2d Cir. 2019). In July 2020, DHS filed a motion to dismiss that petition because Rodriguez had not taken any action in over 100 days. *See id.* Docket Item 27. Rodriguez responded by way of a request for the assignment of counsel. *See id.* Docket Item 31.

Although Rodriguez has caused some of the delay in his removal, he has not "abus[ed] the processes provided to him." *See Hechavarria*, 891 F.3d at 56 n.6 (quoting *Nken*, 556 U.S. at 436). He has applied for relief from removal; requested adjournments to retain counsel and prepare his case; and appealed the IJ's decision to the BIA and then to the Second Circuit. To the extent Rodriguez has delayed the proceedings in the Second Circuit, that appears, as evidenced by his request for counsel, to have been caused by his understandable difficulties in navigating the legal system *pro se*.

What is more, even if some of the delay is attributable to Rodriguez, a significant period of time belongs to the government. For example, DHS issued an immigration detainer to the Nassau County Correctional Facility on February 8, 2018, Docket Item 5-2 at 26, indicating its knowledge at that time that Rodriguez likely was in the country

13

unlawfully.  But DHS did not initiate removal proceedings until four months later, in June 2018.  The IJ also adjourned the removal hearing for a month due to technical difficulties.  And the BIA took nearly six months to decide Rodriguez's appeal. Therefore, the third factor weighs in neither side's favor.

Finally, courts consider the likelihood that the removal proceedings will result in a final order of removal.  This Court declines to weigh the merits of Rodriguez's claims pending before the Second Circuit.

After balancing all these factors, this Court finds that Rodriguez's detention has been unreasonably prolonged.  Therefore, this Court turns to the second step of the two-part inquiry to determine what remedy his unreasonably-prolonged detention demands.

### 2.    The Process Due to Rodriguez

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors," *id.* at 335, namely: "(A) the private interest affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental interest at stake." *Nelson v. Colorado*, 137 S. Ct. 1249, 1255 (2017).  Here, that analysis leads to the conclusion that Rodriguez's continued detention without an individualized hearing, at which the government must justify his continued detention by clear and convincing evidence, fails to "comport with the 'fundamental fairness' demanded by the Due Process Clause."  *See Schall v. Martin*, 467 U.S. 253, 263 (1984).

14

Rodriguez's interest in his freedom pending the conclusion of his removal proceedings deserves great "weight and gravity." *Addington v. Texas*, 441 U.S. 418, 427 (1979).  Rodriguez has an obvious interest in his "[f]reedom from imprisonment— from government custody, detention, or other forms of physical restraint." *Zadvydas*, 533 U.S. at 690.  Moreover, while "[t]he private interest here is not liberty in the abstract, but liberty *in the United States*," *Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999) (emphasis in original), Rodriguez has not conceded his deportability, and the resolution of that issue remains pending before the Second Circuit.  In fact, his interest in liberty *in the United States* must indeed be strong for him to subject himself to unreasonably-prolonged detention while contesting his deportability.  *See Fremont v. Barr*, 2019 WL 1471006, at *6 n.7 (W.D.N.Y. Apr. 3, 2019).

This Court recognizes that the government's interest in detaining Rodriguez also may be strong.  The government contends that Rodriguez's risk of flight and disregard for the law justify his continued detention.  *See, e.g.*, Docket Item 5-3 at 1-8, 16-19, 23-24, 25-26.  In fact, DHS classified Rodriguez as detained under 8 U.S.C. § 1226(c), which applies to noncitizens who fall "into one of several enumerated categories involving criminal offenses and terrorist activities." *Jennings*, 138 S. Ct. at 837. "[Noncitizens] detained under [that] authority are not entitled to be released under any circumstances other than those expressly recognized by the statute."[4]  *Id.* at 846.  Thus, in mandating the detention of criminal noncitizens, the statute reflects a congressional purpose of reducing the risk of flight and danger to the community.  *See Demore*, 538

---

[4] The exception from mandatory detention is a "limited authorization for release for witness-protection purposes," *Jennings*, 138 S. Ct. at 846, not applicable here.

U.S. at 518-19 (explaining that Congress found that "deportable criminal [noncitizens] who remained in the United States often committed more crimes before being removed" and that "20% of deportable criminal [noncitizens] failed to appear for their removal hearings"[5]). "The government's interest in preventing crime by arrestees is both legitimate and compelling." *Salerno*, 481 U.S. at 749. And general concerns about the risk of flight highlight the government's compelling interest in preserving its "ability to later carry out its broader responsibilities over immigration matters." *Doherty*, 943 F.2d at 211.

### 3.    The Insufficient Procedures Used Thus Far to Justify Rodriguez's Prolonged Detention

Turning to the procedures used thus far in this case, Rodriguez received a bond hearing before an IJ. *See* Docket Item 5-3 at 1-4. In that proceeding, the IJ found that he "d[id] not have jurisdiction to release [Rodriquez]" from mandatory detention and that, even if he did, Rodriquez bore the burden of "establish[ing] to the satisfaction of the [IJ] that he . . . d[id] not present a danger to persons or property, [was] not a threat to the national security, and d[id] not pose a risk of flight." *Id.* at 2-3. Rodriguez also received an individualized custody determination, including a personal interview, under 8 C.F.R. § 241.4. *See* Docket Item 5-3 at 21. In that proceeding, Rodriguez bore the burden of "demonstrat[ing] to the satisfaction of the Attorney General that, if released, [he] w[ould] *not* pose a danger to the community, and w[ould] *not* present a flight risk." *Id.* at 21

---

[5] The Court noted that this number included noncitizens who were released from custody *without* an individualized bond hearing. *Demore*, 538 U.S. at 519 n.4 ("Although the Attorney General had the authority to release these [noncitizens] on bond, it is not clear that *all* of the [noncitizens] released were in fact given individualized bond hearings." (emphasis in original)).

(emphasis in original).  The determination was made by a DHS official, rather than by a neutral decisionmaker such as an IJ.  *See id.* at 25-26.

This Court concludes that in light of the procedures used thus far, there is a significant risk of an erroneous deprivation to Rodriguez's liberty interests.  Section 1226(c) prohibits the government from offering a detainee the opportunity to challenge whether he is, in fact, a danger or a flight risk.  *Jennings*, 138 S. Ct. at 846.  To the extent an IJ did consider whether release was appropriate, Rodriquez—not the government—bore the burden of establishing that he was neither a danger to the community nor a flight risk.  Now that Rodriguez's detention has become unreasonably prolonged, due process requires a greater opportunity to be heard "at a meaningful time and in a meaningful manner," *Armstrong*, 380 U.S. at 552.

An opportunity to be heard in a meaningful manner necessarily requires a hearing that "satisfies the constitutional minimum of fundamental fairness."  *Santosky v. Kramer*, 455 U.S. 745, 756 n.8 (1982) (citation omitted).  When the government seeks the civil detention of a person to effect a compelling regulatory purpose, it must show by clear and convincing evidence that such detention is necessary to serve that compelling interest.  *See Foucha v. Louisiana*, 504 U.S. 71, 81-83 (1992); *Addington*, 441 U.S. at 432-33; *see also Santosky*, 455 U.S. at 756 (explaining that the "clear and convincing evidence" standard applies "when the individual interests at stake in a . . . proceeding are both 'particularly important' and 'more substantial than mere loss of money'" (quoting *Addington*, 441 U.S. at 424)).  That standard applies equally here.

To sustain the prolonged detention of a noncitizen subject to removal proceedings based on its general interests in immigration detention, the "[g]overnment

[is] required, in a 'full-blown adversary hearing,' to convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person," *Foucha*, 504 U.S. at 81 (quoting *Salerno*, 481 U.S. at 751), or ensure that the noncitizen will appear for any future proceeding.[6]  This requires consideration of less restrictive alternatives to detention.  *See id.*; *cf. United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When a plausible, less restrictive alternative is offered to a" regulation burdening a constitutional right, "it is the [g]overnment's obligation to prove that the alternative will be ineffective to achieve its goals.").

## CONCLUSION

Rodriguez's detention has been unreasonably prolonged.  Because section 1226(c) does not require an individualized hearing in which the government must demonstrate by clear and convincing evidence that no conditions of release can reasonably serve the government's compelling regulatory interests in detaining him, it is unconstitutional as applied to him.  As such, his continued detention violates the Due Process Clause.

Rodriguez must be released unless, no later than **14 calendar days from the date of this decision and order**, the government demonstrates by clear and convincing evidence before a neutral decisionmaker that Rodriguez's continued

---

[6] As this Court explained in *Hemans*, 2019 WL 955353, at *8 n.7, a pretrial detainee's right to a speedy trial distinguishes the interests supporting the evidentiary standard traditionally applicable to flight-risk determinations for pretrial detention purposes from what is required after an unreasonably-prolonged immigration detention.

detention is necessary to serve a compelling regulatory purpose—such as preventing flight or protecting others or the community.  The decisionmaker also must consider—and must address in any decision—whether there is clear and convincing evidence that there are no less-restrictive alternatives to physical detention, including release on bond in an amount the petitioner can reasonably afford, with or without conditions, that also would reasonably address those same regulatory purposes.

## **ORDER**

In light of the above, IT IS HEREBY

ORDERED that **within 14 calendar days of the date of this decision and order**, the government must release Rodriguez from detention unless a neutral decisionmaker conducts an individualized hearing to determine whether his continued detention is justified; and it is further

ORDERED that at any such hearing, the government has the burden of demonstrating by clear and convincing evidence that Rodriguez's continued detention is necessary to serve a compelling regulatory purpose, such as minimizing risk of flight or danger to the community.  Whether detention is necessary to serve a compelling regulatory purpose requires consideration of whether a less-restrictive alternative to detention would also address the government's interests.  In other words, the decisionmaker must find that no condition or combination of conditions of release can reasonably ensure Rodriguez's appearance and the safety of the community—that is, even with conditions, Rodriguez presents an identified and articulable risk of flight or a threat to an individual or the community; and it is further

ORDERED that **within 30 days of the date of this decision and order,** the government shall file an affidavit certifying compliance with this order.  That affidavit should include a copy of the bond hearing order.


SO ORDERED.

Dated:        September 23, 2020
              Buffalo, New York


              */s/ Lawrence J. Vilardo*
              LAWRENCE J. VILARDO
              UNITED STATES DISTRICT JUDGE